## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 3:11CR92–HEH |
| | ) | |
| PRETTY BOY COE, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION
### (Denying Defendant's Motion to Suppress Statements and Evidence)

This case evolves from the seizure of drugs and a firearm during the course of a traffic stop in the City of Richmond. It is presently before the Court on the defendant's Motion to Suppress Statements and Evidence. The defendant's challenge focuses on whether the police had reasonable suspicion that the defendant was armed and dangerous. Both the defendant and the United States have filed detailed memoranda supporting their respective positions. The Court received evidence and heard oral argument on June 21, 2011. At the close of that hearing, the Court invited the parties to submit supplemental memoranda. Because the issues for resolution are fact dependent, a detailed recital of the evidence is necessary.

### I.

On the evening of Thursday, January 6, 2011, Officers Robert Kleinholz ("Kleinholz") and Brady McWhirter ("McWhirter") of the Richmond City Police Department ("RPD") were on patrol in Richmond's Fourth Precinct, an area in the Northside of the city which included Highland Park, Brookland Park, North Avenue,

Chamberlayne Avenue, and Laburnam Avenue. Kleinholz, who had been employed by

the RPD since 2001, regularly worked the evening patrol shift in that area.[1]  McWhirter

likewise worked patrol on the Northside for approximately five years. Both expressed

familiarity with criminal activity in the Brookland Park area.

Around 6:00 p.m., McWhirter and Kleinholz were traveling eastbound on

Brookland Park Boulevard when they approached Beez, Buzz & Cutz, a/k/a Beez, Cutz

& Stylez ("Beez"), a barbershop located in the 100 block of Brookland Park Boulevard

near Garland Avenue. According to Kleinholz, the Brookland Park/Garland Avenue area

is a "continuing problem area. A continuing open air drug market" (Tr. 13:15–16) with

"a high propensity for violence" (Tr. 12:14). Kleinholz added that Thursdays and Fridays

are "triple squad days," which require additional police units to handle the high volume

of calls. (Tr. 11:4–7.) From his years of experience making arrests and conducting

debriefings, Kleinholz knew that Thursdays are especially heavy drug-trafficking days.

He testified that dealers frequently move drugs during rush hour, when traffic is heavy

and police attention is diverted to accidents and other incidents.

According to Kleinholz, "there have been several shootings. . . robbery reports,"

and incidents involving guns around Beez. (Tr. 12:14–17.) To Kleinholz's knowledge,

the RPD at that time had an open investigation of Beez for distribution of narcotics.[2]

---

[1] Kleinholz left briefly to work for the Great Falls Police Department in Montana in 2005, but
returned to the RPD in 2006. While employed with the RPD, he worked patrol, except for a one
and half-year stint working on the Focus Mission Team ("FMT"). The FMT was an extension of
his patrol functions, directed toward "trouble spots." (Tr. 8:17; 42:3–4.)

[2] There is no dispute, however, that Beez also conducts legitimate business as a barbershop and
salon. It is frequently open for business at or after 6:00 p.m.

McWhirter confirmed that it is a known "hotspot for drugs." (Tr. 85:24.) An RPD police report log similarly showed that, although no arrests had been made in the 100 block of West Brookland Park Boulevard between July 6, 2010 and January 6, 2011, over 30 crimes were reported during that time frame in the 3000 block of Garland Avenue, which sits "right there at West Brookland Park Boulevard" where Beez is situated. (Tr. 75:5–7; *see also* Def. Ex. 1 at 7–9.) These crimes included numerous assaults, along with weapons and narcotics violations. (Def. Ex. 1 at 7–9.)

As the officers approached Beez, they saw a man enter the rear driver's-side door of a silver Chevy Impala, which was parked facing westbound in front of Beez. The Impala's windows appeared to Kleinholz and McWhirter to have an illegal degree of tint.[3] Because the Impala's brake lights were on, McWhirter and Kleinholz suspected that the vehicle might enter traffic. Accordingly, they "circled the block to see if the car was still going to be there when [they] came back around." (Tr. 16:25–17:1.)

When the officers returned to Beez, the Impala was gone. As they drove down Brookland Park toward Chamberlayne Avenue, however, they again observed the silver Impala about three quarters of a mile ahead. The Impala turned right onto Chamberlayne. McWhirter and Kleinholz followed and eventually pulled in behind the Impala. After about a half mile, the officers proceeded through the traffic signal at Westwood Avenue, and activated their emergency equipment to effect a traffic stop.

Both officers testified that the Impala was in the right-hand lane of Chamberlayne

---

[3] Linda McGrew, an investigator for the Federal Public Defender, viewed and took pictures of the Impala around 9:00 p.m. in June of 2011. She confirmed that the windows were remarkably dark.

Avenue at that time.  According to the officers, the Impala signaled a right-hand turn in front of an apartment building, then crossed over to the left northbound lane.  When the Impala paused at the median between Chamberlayne's north- and south-bound lanes, it looked to the officers as though it "was going to dart across to . . . Melrose Avenue."  (Tr. 21:20–21.)

The driver of the Impala, Amber Blake ("Blake"), recounted a slightly different version of the events.  Blake testified that she was already in the left-hand lane when the officers activated their lights.  According to Blake, she thought it would be easier to make a U-turn and stop facing southbound than it would have been to change lanes and stop facing northbound.  In any event, the Impala made the U-turn and pulled over within approximately 20 yards, stopping at the curb in front of a bus shelter.  McWhirter and Kleinholz stopped their police vehicle behind the Impala.

McWhirter, who was driving the patrol car, approached the front driver's-side door.  McWhirter advised Blake of the reason for the stop and explained Virginia's window-tint restrictions.  To enhance visibility inside the vehicle, McWhirter shined his flashlight in through Blake's open window.  "[W]ithin seconds" (Tr. 95:21–22), McWhirter saw what appeared to be a "plastic baggie" (Tr. 82:14–15) clenched in the left fist of the front-seat passenger, later identified as the defendant, Pretty Boy Coe ("Coe").  McWhirter observed the baggie for approximately three seconds.  According to the officer, it was protruding from the pinky-finger side of Coe's left fist, which was sitting on or around Coe's left leg with his fingertips facing downward.

4

McWhirter knew from his experience in the Gilpin Court area[4] that plastic

sandwich baggies were common implements of drug possession and/or distribution. He

indicated to Kleinholz, both verbally and with his hand, that Coe had something in his

fist.[5] McWhirter could not recall whether he specified that Coe had a "baggie" in his

hand or simply indicated Coe had "something in his hand." (Tr. 83:5–7.) He testified

unequivocally, however, that "[t]he window was down" when he made the observation.

(Tr. 82:25.)

While McWhirter conversed with the driver, Kleinholz was positioned at the "A

pillar"—the area between the windshield and the front door—on the passenger's side of

the vehicle. After McWhirter alerted him to the object in Coe's hand, Kleinholz looked

through the closed passenger window and "saw the same thing. In [Coe's] left hand,

there was a small corner of something." (Tr. 28:24–25.) Kleinholz initially conceded

that it "[c]ould have been a piece of paper or the corner of a baggie." (Tr. 29:1–2.) On

cross exam, he clarified that "[i]t was the corner of a baggie type object," but he "didn't

know what it was." (Tr. 62:3, 6.) He further stated that he only got a "glimpse" of the

object, and probably saw it for "[l]ess than . . . a second." (Tr. 62:8.) Kleinholz

confirmed, however, that Coe's hand was "down by his left leg, between his leg and the

console." (Tr: 29:5–6.) Although Kleinholz was at that time looking through the closed

passenger window, he also testified that "[i]t was right there when [Coe] rolled the

---

[4] The Gilpin Court area of Richmond has a reputation for violence and drug trafficking.
[5] McWhirter could not recall whether he mentioned having seen the object to Kleinholz while
they were standing at the Impala or whether he waited until they had returned to the police
cruiser. Kleinholz, however, testified that McWhirter indicated the presence of the object while
the officers were standing at the Impala.

window down and I asked for his identification." (Tr. 63:1–2.)

Kleinholz testified that Coe's left hand subsequently "disappeared" downward "by [Coe's] leg and the console." (Tr. 29:9, 12.) Coe's left hand later reappeared on Coe's left thigh. Kleinholz testified that Coe turned his hand over and revealed "an empty open hand." (Tr. 29:23.) At this point, Kleinholz "was concerned that there was [sic] possibly drugs in the car . . . [b]ecause whatever object it was disappeared with no reasonable explanation as to what it was or where it went." (Tr. 30:1–2, 5–7.)

On cross, Kleinholz was questioned at length about whether he saw Coe do anything other than drop his left hand out of sight. Specifically, Kleinholz was asked whether he noticed Coe talking on a phone or retrieving Blake's license and registration. Kleinholz testified that Coe "might have had a phone in his hand," but he could not recall. (Tr. 65:16–19.) Kleinholz did not notice whether Coe opened the glove compartment or handed a purse to Blake. Blake, Coe's girlfriend of about one year, testified that Coe was on the phone when officers initiated the stop, and that he was holding his phone in his right hand. She further testified that Coe handed her purse to her and retrieved her registration from the glove box during the stop. Coe's window remained closed during this time.

Shortly thereafter, Kleinholz knocked on Coe's window to ask for identification. By this time, McWhirter had already obtained identification from Blake and Jibrail Jefferson ("Jefferson"), the rear-seat passenger.[6] Coe did not produce photo

---

[6] Officers subsequently learned that Jefferson was the man who had entered the Impala in front of Beez. Blake testified that Coe, Blake, and Jefferson had gone to Beez so that Jefferson could

6

identification, but provided Kleinholz his name, which Kleinholz recognized. He testified that he associated the name with "drugs and violence." (Tr. 31:8.)  Kleinholz wrote Coe's information on his notepad and passed it to McWhirter over the roof of the Impala.

After returning to his vehicle, McWhirter ran Blake, Coe, and Jefferson's names through PISTOL, the Richmond Police database that tracks law enforcement's official interactions with the general public, such as field contacts, traffic stops, and police reports.  PISTOL revealed that Jefferson and Coe each had previous contacts with the police.  Neither McWhirter nor Kleinholz could recall the nature of the incidents in PISTOL concerning Coe, but Kleinholz remembered seeing that Coe had several recent interactions with police in Gilpin Court and a drug violation from five or six years ago. Coe was not flagged in PISTOL as "probably armed." (Tr. 60:17.)[7]

At that point, McWhirter called for a K-9 unit.  According to Kleinholz, they requested the K-9 unit for extra manpower and because they suspected drug activity. While they waited for the drug dog to arrive, McWhirter, after verifying the accuracy of his window-tint meter, measured the Impala's window tinting, and confirmed that it exceeded the legal standard.  He then wrote a summons, and asked Blake to step out of the vehicle to sign it.

Kleinholz, who had returned briefly to the police vehicle while McWhirter was accessing the PISTOL database, remained positioned at the A pillar of the Impala's

---

retrieve his coat from his cousin.
[7]No evidence was presented as to the criteria or circumstances which would warrant designating an individual as "probably armed."

passenger side for the balance of the stop. He testified that Coe's demeanor was "dramatically different" from that of Blake and Jefferson. (Tr. 36:22–23.) Specifically, Kleinholz noted that "[h]e was very cold," and "[h]is movements were very direct." (Tr. 36:23–25.) In contrast, the other passengers' interactions were conspicuously more fluid. Based on Kleinholz's years of experience on patrol and interacting with people, Coe's demeanor further kindled Kleinholz's concerns "[t]hat there was a firearm in the car and that there was [sic] . . . narcotics in the car." (Tr. 73:24–25.)

Even though Kleinholz "was concerned that they may be armed" (Tr. 35:14), he testified that he made the tactical decision not to order Jefferson and Coe out of the vehicle at that time because "we had someone else coming, and they appeared to be contained. We knew who they were, and there was no reason to pull them out and provoke the situation and make it more aggressive than it was—just a traffic stop at this point . . . ." (Tr. 35:17–21.) The officers were also outnumbered. (*See* Tr. 27:21, 34:9.)

Coe recorded approximately three minutes of the stop on his cell phone, the contents of which were introduced during the suppression hearing. Kleinholz testified that the events in Coe's three-minute video occurred fifteen to twenty minutes into the stop. In the video, Kleinholz asked Coe if they had "weed" in the car that the officers should know about before conducting the canine sniff. Kleinholz clarified on the witness stand that he "was never concerned about weed," and that he referenced weed (marijuana) as a "verbal ploy"—a way to persuade the occupants to confess to a relatively insignificant crime, and avoid any unnecessary escalation. (Tr. 73:3, 22.)

When the K-9 officer arrived, he advised Blake that they were going to perform a

canine scan of the vehicle. He asked McWhirter to direct the occupants to step out of the car. McWhirter walked over to the passenger's side of the Impala, knocked on Coe's window, which was again closed, and instructed Coe to exit the vehicle. McWhirter also inquired if Coe had any weapons and advised that he was going to pat him down for officer safety. Coe responded, "You can't search me." (Tr. 88:16.) McWhirter attempted to pat down Coe three or four times, but Coe repeatedly dropped his arms to his sides. Finally, McWhirter placed Coe's hands on the roof of the Impala, performed a patdown, which revealed the butt of a handgun in Coe's waistband.

After confirming that Coe was a convicted felon, he was arrested for possession of a firearm by a felon. A search incident to arrest revealed four Percocet pills, Oxycodone, and a baggie containing two separate baggies of crack cocaine in Coe's jacket pockets. From the floor of the vehicle on the left-hand side of the front passenger's seat area, McWhirter also recovered Blake's purse, which contained marijuana and bullets, each of which were packaged in plastic baggies. Kleinholz testified that the purse was found in "[e]xactly the same spot" where Coe's left hand had disappeared earlier in the stop. (Tr. 40:15.)

Coe also made several incriminating statements during the search.[8]  Specifically, he stated that he put the marijuana and bullets in Blake's purse. Blake likewise testified that the bullets and marijuana were not hers, and that "somebody put the marijuana and the bullets into the purse that was sitting right by [Coe's] left leg" (Tr. 128:5–7) at some

---

[8] The defendant urges the Court to suppress these statements as the product of his illegal detention.

point after Blake got into the car that day.

## II.

The central issue at this juncture is whether Officers Kleinholz and McWhirter had reasonable suspicion to conclude that the defendant was armed and dangerous at the time he was patted down for weapons.  In advancing his argument, the defendant adopts a granular analysis of the evidence, parsing and minimizing each factor relied upon by the officer.  He ultimately contends that even when viewed collectively, the information available to the officers would not suggest that he was armed and dangerous.

The defendant initially disputes the officer's characterization that the neighborhood around Beez was a high crime area.  He offers statistical data showing little or no criminal activity on the immediate block where the barbershop is located—West Brookland Park Boulevard.  (Def.'s Ex. 1 at 3.)

Using the same exhibit, the government, however, points out several pages of reported calls for police service on adjoining streets.  These included guns, drugs, and other violent activity.  (Def.'s Ex. 1 at 7–9.)  Relying on *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993), the government argues that an area's propensity toward criminal activity is a significant ingredient in an officer's formulation of reasonable suspicion.

The defendant also contests the officer's description of the vehicle as being driven in an evasive manner prior to being stopped.  The operator of the vehicle, Blake, denied driving evasively and offered an arguably plausible explanation.  Officer Kleinholz, on the other hand, testified that rather than pull immediately to the curb, the vehicle swerved

into the left lane and executed a U-turn before stopping. The officer, who was obviously unaware of the driver's thought process at the time, described the driving behavior as evasive. Coupled with the car's presence moments earlier in an area known for drugs and violence, the maneuver heightened the officer's suspicion. Again, the government maintains that such evasive conduct "may inform an officer's appraisal of a streetcorner encounter." *Lender*, 985 F.2d at 154.

Next, the defendant maintains that the mere fact that he may have had previously documented involvement with guns and drugs is insufficient to support a finding of present reasonable suspicion. In support of this position, the defendant cites *United States v. Foster*, wherein the court observed that "[a] prior criminal record 'is not, standing alone, sufficient to create reasonable suspicion.'" 634 F.3d 243, 246 (4th Cir. 2011) (quoting *United States v. Davis*, 94 F.3d 1465, 1469 (10th Cir. 1996)). In applying this holding, it is important to note that the court in *Foster* added, "[the officer] was required to pair his prior knowledge of Foster's criminal record with some more 'concrete factors' to demonstrate that there was a reasonable suspicion of current criminal activity." *Id.* (quoting *United States v. Sprinkle*, 106 F.3d 613, 617 (4th Cir. 1997)).

In *Foster*, the Fourth Circuit concluded that the information available to the arresting officer was insufficient to warrant the investigative detention of the defendant. The defendant urges this Court to square the evidence in the immediate case with the facts found insufficient by the Fourth Circuit in *Foster*.

In *Foster*, the investigating officer offered three factors, taken together, which led him to initiate the stop in question. These consisted of:

11

(1) his prior knowledge of Foster's criminal record; (2) Foster's sudden appearance from a crouched position in a parked car, immediately after the driver had apparently said something to him after seeing the detective walking towards them; and (3) Foster's frenzied arm movements, including the movement of his arms down toward the floor of the car.

*Id.* The government rejoins that the facts in the immediate case are easily distinguishable from *Foster*.

Lastly, and perhaps most importantly, the defendant suggests that this Court reject the testimony of both Officers Kleinholz and McWhirter describing a baggie-type object purportedly observed in the defendant's hand when the officers approached the vehicle. The defendant dismisses their observations as inherently incredible. To counter this observation, the defendant introduced the testimony of Linda McGrew, an investigator with the Federal Public Defender's Office. Investigator McGrew testified that at 9:00 p.m. on the Sunday night prior to the hearing on this motion, she attempted to peer inside the silver Impala occupied by the defendant at the time of the incident in question. When asked what she was able to see, Investigator McGrew replied, "[p]ractically nothing until I got right up to the window and pressed my face against the window and then my eyes had to adjust to the darkness, then I could see the interior. But I was actually amazed at how dark it was inside the car." (Tr. 113:17–21.) Unlike the officers, McGrew apparently was not using a flashlight at the time.[9]

---

[9] The defendant also contends that the officer's action—allowing the occupants to remain seated in the vehicle during the investigation—is inconsistent with a well-formed belief that the occupants were armed and dangerous. Officer Kleinholz, however, explained his rationale for the strategy. (*See* Tr. 35:17–22).

produce

the

In the defendant's view, the circumstances relied upon by the officers to articulate reasonable suspicion amount to no more than a strained composite of readily explainable events creatively adorned with a speculative spin.[10] He adds that, when dissected and examined individually, the facts fall far short of demonstrating the requisite articulable suspicion. The government notes in response that reasonable suspicion is a product of the *totality* of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time. *United States v. Arvizu*, 534 U.S. 266, 273, 122 S. Ct. 744, 750 (2002). In *Arvizu*, the Supreme Court counseled trial courts that "reasonable suspicion" is not a "finely-tuned standard" which lends itself to the type of "divide-and-conquer analysis" suggested in the immediate case. *Id.* at 274, 122 S. Ct. at 751.

### III.

The United States Supreme Court has long recognized that traffic stops are "especially fraught with danger to police officers." *Michigan v. Long*, 463 U.S. 1032, 1047, 103 S. Ct. 3469, 3480 (1983). Courts have cautioned that to minimize the risk of harm, officers should exercise unquestioned command of the situation. *Maryland v. Wilson*, 519 U.S. 408, 414, 117 S. Ct. 882, 886 (1997).

In the immediate case, after observing an apparent violation of Virginia Code Section 46.2-1052,[11] Officers Kleinholz and McWhirter had unquestionable authority to

---

[10] "A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277, 122 S. Ct. 744, 753 (2002).
[11] Virginia Code Section 46.2-1052 provides that "[n]o sun-shading or tinting films may be applied or affixed to the front side windows of any motor vehicle operated on the highways of

stop the vehicle occupied by the defendant.  *See United States v. Branch*, 537 F.3d 328,

335 (4th Cir. 2008).  This observation provided sufficient justification to detain "the

offending vehicle for as long as it takes to perform the traditional incidents of a routine

traffic stop."  *Id.*  Even if Officers Kleinholz and McWhirter suspected that other criminal

activity was afoot, such "subjective motives are irrelevant to a proper Fourth Amendment

analysis."  *United States v. Bullock*, 94 F.3d 896, 899 (4th Cir. 1996).  *See also Ashcroft*

*v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011); *Whren v. United States*, 517 U.S. 806, 813–14,

116 S. Ct. 1769, 1774 (1996).[12]

    While the arguably evasive driving behavior observed prior to the traffic stop and

the defendant's demeanor when confronted may have heightened the officers' concern,

other factors demonstrated reasonable suspicion that the occupants of the vehicle may be

armed and dangerous.  Initially, both Officers Kleinholz and McWhirter described the

general area where they originally encountered the vehicle as having a reputation for drug

trafficking and violence.  (Tr. 12:14–17; 85:24.)  Furthermore, Kleinholz testified that the

barbershop was familiar to him and that he understood it was under investigation for drug

activity.  Kleinholz also indicated that based on his years of experience patrolling this

area of Richmond, Thursdays were considered to be high volume drug trafficking days.

January 6, 2011 was a Thursday.  As the United States Court of Appeals for the Fourth

Circuit noted in *Lender*,

---

this Commonwealth that reduce total light transmittance of such window to less than 50
percent."  Va. Code Ann. § 46.2-1052.

[12] The defendant invites the Court to factor racial dynamics into its analysis.  The evidence,
however, does not suggest any motive for the officers' actions other than the investigation of
suspected criminal activity.

> Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street. Here, the officers personally knew that the area they were patrolling had a large amount of drug traffic. While the defendant's mere presence in a high crime area is not by itself enough to raise reasonable suspicion, an area's propensity toward criminal activity is something that an officer may consider.

985 F.2d at 153.

Officer McWhirter testified that when he approached the driver's side of the vehicle, the driver lowered her window. (Tr. 82:25.) As the officer addressed the driver, he illuminated the interior with his flashlight. At this point, Officer McWhirter informed Officer Kleinholz, who was standing next to the passenger side of the car, that he had observed something in the passenger's hand. On direct examination, McWhirter further described it as a baggie-type object clinched in the defendant's left fist. McWhirter testified that he considered the object to be consistent with drug activity. (Tr. 82:20–21.) Officer Kleinholz, who was standing outside the window adjacent to the defendant, saw what appeared to be a corner of a baggie in the defendant's left hand. Kleinholz then witnessed the defendant lower his left hand until it disappeared from sight. When it reappeared, the defendant's hand seemed to be empty. (Tr. 29:23.) Kleinholz testified that the disappearance of the object raised his suspicion that drugs may be in the vehicle.

The defendant dismisses the officer's observation of the clinched baggie-type object as incredible and "simply nonsensical." (Def.'s Reply Mem. 2.) With respect to the officer's credibility, it is noteworthy that plastic baggies containing controlled substances and ammunition were later seized from the driver's purse, which was situated in the general proximity where the defendant lowered his hand with the clinched baggie-

type object. Although this subsequent discovery cannot be considered for the purpose of determining whether or not there was reasonable suspicion, it is probative in determining the credibility of the witnesses. This is particularly so in light of the defendant's apparent charge of fabrication.

The officers' suspicion in this case was further bolstered when they learned of the defendant's prior contacts with the Richmond City police. Although the details were scant, Officer Kleinholz testified that his inquiry revealed that the defendant had an earlier drug arrest and had several recent field contacts in Gilpin Court. (Tr. 33:10–13.)

There is no persuasive reason in this case for the Court to discredit the observations of Officers Kleinholz and McWhirter or their experience-based impressions of the community they patrolled on a daily basis. The officers were able to articulate and logically explain why they found the particular behavior in this case to be consistent with drug activity. Moreover, their candid concessions of some uncertainty in their observations belies the suggestion of dissembling. As the United States Supreme Court observed in *Ornelas v. United States*, reasonable suspicion is a "commonsense, nontechnical conception[] that deal[s] with 'the factual and practical considerations of everyday life . . . .'" 517 U.S. 690, 695, 116 S. Ct. 1657, 1661 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231, 103 S. Ct. 2317, 2328 (1983)). In evaluating alleged violations of the Fourth Amendment, courts must "first undertake[] an objective assessment of an officer's actions in light of the facts and circumstances then known to him." *Scott v. United States*, 436 U.S. 128, 137, 98 S. Ct. 1717, 1723 (1978).

16

After concluding that the officers reasonably suspected drug activity inside the vehicle, the next question for the Court is whether the officers harbored reasonable suspicion that the defendant was armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 129 S. Ct. 781, 784 (2009). In *United States v. Rooks*, the Fourth Circuit had occasion to apply *Arizona v. Johnson* to facts similar to those presently before the Court. In *Rooks*, Judge King, speaking for the Court, noted that, "[u]nder our precedent, an officer who has reasonable suspicion to believe that a vehicle contains illegal drugs may order its occupants out of the vehicle and pat them down for weapons." 596 F.3d 204, 210 (4th Cir. 2010) (citing *United States v. Sakyi*, 160 F.3d 164, 169 (4th Cir. 1998)). The Fourth Circuit has long recognized the close association between firearms and the drug trade. *United States v. Perry*, 560 F.3d 246, 251 (4th Cir. 2009).

Therefore, under the clear precedent of the Fourth Circuit, applied in the wake of *Arizona v. Johnson*, Officers Kleinholz and McWhirter possessed the requisite articulable suspicion to justify the removal of the defendant from the vehicle and a pat down of his person for weapons. The defendant's Motion to Suppress Statements and Evidence will accordingly be denied.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
United States District Judge

Date: Jul 1 2011
Richmond, VA

17